1   SNYDER ♦ DORENFELD, LLP
    David K. Dorenfeld, (SBN 145056)
2   Michael W. Brown, (SBN 205380)
    5010 Chesebro Road
3   Agoura Hills, CA 91301
    Telephone: (818) 865-4000
4   Fax:  (818) 865-4010

5   CATHY JACKSON LERMAN, PA
    Cathy J. Lerman – To be Admitted Pro Hac Vice
6   #118, 1440 Coral Ridge Drive
    Coral Springs, FL 33071
7   Telephone: (954) 332-1143
    Facsimile: (800) 305-2351
8   Email: clerman@lermanfirm.com

9   BURSOR & FISHER, P.A.
    L. Timothy Fisher (State Bar No. 191626)
10  1990 North California Blvd., Suite 940
    Walnut Creek, CA 94596
11  Telephone: (925) 300-4455
    Facsimile: (925) 407-2700
12  Email: ltfisher@bursor.com

13  Attorneys for Plaintiff

14              **UNITED STATES DISTRICT COURT**

15            **NORTHERN DISTRICT OF CALIFORNIA**

16                 **SAN JOSE DIVISION**

17  ANTONIA LONERGAN, individually and on )   Case No.:  **C13-2081**
    behalf of a class of similarly situated persons, )
18                                              )   **CLASS ACTION COMPLAINT**
                                                )
19                 Plaintiff,                   )   **JURY TRIAL DEMANDED**
                                                )
20  v.                                          )
                                                )
21  PROVIDENT TRUST GROUP, LLC, MY              )
    SELF DIRECT, LLC, BAY AREA EQUITY           )
22  GROUP, LLC, VANGUARD TITLE                  )
    INSURANCE AGENCY, LLC,  ANTRANIK            )
23  KABAJOUZIAN a/k/a ANTO                      )
    KABAJOUZIAN,  and DOES 1-3,                 )
24                                              )
                                                )
25                 Defendants.                  )
                                                )
26                                              )
                                                )
27  _____ )

28

---

CLASS ACTION COMPLAINT

Plaintiff ANTONIA LONERGAN ("Plaintiff"), individually and on behalf of a class of similarly situated entities and/or persons, respectively, brings this action, by and through her undersigned counsel, and alleges as follows:

## I.  INTRODUCTION

1.      This is a class action lawsuit wherein a Custodian of Self-Directed Individual Retirement Accounts ("SDIRAS") and its marketing affiliates and agents as well as their co-conspirators violated the law, stole the investments and cash of their account holders (Plaintiff and the Class Members) through Ponzi schemes, aided and abetted fraud, and facilitated the sale of illegal securities from unlicensed investment sponsors who were their agents.[1]

2.      At all relevant times, Defendants PROVIDENT TRUST GROUP, LLC, MY SELF DIRECT, LLC, BAY AREA EQUITY GROUP, LLC, VANGUARD TITLE INSURANCE AGENCY, LLC, ANTRANIK KABAJOUZIAN a/k/a ANTO KABAJOUZIAN and DOES 1-10 operated as a common enterprise selling illegal, unregistered securities and SDIRA Custodian/Administrator ("Custodian" or "Administrator") services to their victims/targets including Plaintiff and the other Class Members.

3.      As a result of Defendants' fraudulent conduct many investors, including Plaintiff and the Class Members, lost their life savings.

## II.  THE PARTIES

4.      Plaintiff ANTONIA LONERGAN ("LONERGAN") is a resident of Sacramento, California.

5.      On or about June of 2012, LONERGAN invested approximately $138,000 through a PROVIDENT TRUST SDIRA in a fraudulent enterprise resulting in a total loss of her investment.

---

[1]      A SDIRA is an individual retirement account ("IRA") held by a trustee or custodian that permits investment in a broader set of assets than is permitted by most IRA custodians. SDIRA account holders are permitted to invest in a variety of nontraditional investment options of their own choosing, including tax lien certificates, promissory notes, real estate, businesses, and LLCs. SDIRAS are administered by custodians or trustees.  It is estimated that approximately $94 billion was held in SDIRAS in the United States in 2011.

On or about December of 2012, LONERGAN invested approximately $150,000 in cash in a fraudulent enterprise resulting in a total loss of her investment.

6.     PROVIDENT TRUST GROUP, LLC ("PROVIDENT TRUST") is a Nevada independent corporate trust company with its principal place of business in Las Vegas, Nevada. PROVIDENT TRUST is a SDIRA Administrator/ Custodian who claims to be "built on a foundation of integrity and ethics dedicated to educating, empowering and positioning people on how to take control of their financial future by leveraging the benefits of self-directed investing." PROVIDENT TRUST has over 30,000 clients in 50 states with over $3 billion under management.

7.     MY SELF DIRECT, LLC ("MY SELF DIRECT") is a Nevada limited liability company with its principal place of business in San Mateo, California.   MY SELF DIRECT owns the url: www.myselfdirect.com.  MY SELF DIRECT is an "IRA facilitator" who markets for and refers potential SDIRA clients to PROVIDENT TRUST. The phrase "MY SELF DIRECT" is a trademark of PROVIDENT TRUST.

8.     BAY AREA EQUITY GROUP, LLC ("BAE") is a California limited liability company with its principal place of business in Campbell, California. BAE owns the url: www.bayareaselfdirect.com,     which    will    be    referred    to    herein    as "BAYAREASELFDIRECT.COM."

9.     BAE sells unregistered securities in real estate through unlicensed sales representatives    and    through    the    websites:    www.bayareaequitygroup.com    and www.guaranteedrentalproperties.com. BAE also sells SDIRA services for MY SELF DIRECT and PROVIDENT TRUST through its unlicensed sales representatives, the websites referenced in this paragraph and BAYAREASELFDIRECT.COM.

10.     MY   SELF   DIRECT   owns   the   content   of   and   the   copyright   to BAYAREASELFDIRECT.COM.

11.     VANGUARD   TITLE   INSURANCE   AGENCY,   LLC   ("VANGUARD")   is   a Michigan limited liability company with its principal place of business in Sterling Heights, Michigan. VANGUARD handled the processing of purchases of real estate by Plaintiff and the Class Members from BAE through cash transactions and PROVIDENT TRUST SDIRAS.

12.     Defendant ANTRANIK KABAJOUZIAN a/k/a ANTO KABAJOUZIAN ("KABAJOUZIAN") is an individual and a resident of San Jose, California.

13.     At all times material hereto, KABAJOUZIAN was the agent of BAE.

14.     At all times material hereto, KABAJOUZIAN, BAE, and MY SELF DIRECT served as SDIRA record keepers, marketing affiliates and agents of PROVIDENT TRUST.

15.     The parties are so inextricably intertwined and have such a commonality and unity of interest that it is necessary to have a chart to keep track of the incestuous relationships they have with each other.



16.     As such, it is clear that the relationship and association between PROVIDENT TRUST, MY SELF DIRECT, BAE, and KABAJOUZIAN was and is multi-faceted and long-standing; it involves and involved shared personnel, resources, and control.   These Defendants shared a unity and commonality of interest with one another, and the relationship and association lacked independence between one another.

17.     Plaintiff is unaware of the true names and capacities of the Defendants sued herein as DOES 1 through 3, inclusive, and therefore sues these Defendants by such fictitious names because DOES 1 through 3 are responsible in some manner for the activities alleged herein and each was acting as an agent for the others.

18.     Plaintiff will amend this Complaint to add the true names of DOES 1 through 3 once they are ascertained. Whenever reference is made to Defendants, such reference shall include all Defendants including DOES 1 through 3.

19.     At all relevant times, each of the Defendants acted as a principal, agent, representative, or employee of each of the other Defendants and acted within the course and scope of said agency or representation or employment, and with the permission and ratification of the other Defendants.

20.     At all relevant times, each Defendant knew or realized that the other Defendants were engaging in or planned to engage in the violations of law alleged in this complaint. Knowing or realizing that other Defendants were engaging in such unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts. Each Defendant intended to, and did, encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

21.     Defendants have also engaged in a conspiracy, common enterprise, and common course of conduct, the purpose of which is and was to engage in the violations of law alleged in this complaint. The conspiracy, common enterprise, and common course of conduct continue to the present.

### III.   <u>JURISDICTION AND VENUE</u>

22.     The Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332 (d) (2) and the Class Action Fairness Act. Plaintiff and certain Defendants are citizens of different states. The amount in controversy exceeds $5,000,000, exclusive of interest and costs.

23.     This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. § 1965, the Due Process clause of the U.S. Constitution, and the California long-arm statute, *Code of*

*Civil Procedure* § 410.10, which allows courts to "exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States." Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's additional claims arising under California state law for violation of California's Unfair Competition Law (Business and Professions Code § 17200 *et seq*).

24.    Venue in this district satisfies the requirements of 28 U.S.C. §1391 (b) (1)-(2) because some Defendants reside in this jurisdiction and some of the actions and events giving rise to the claims occurred in this District.

25.    Defendants, at all times material hereto, have engaged in "trade or commerce" by advertising, soliciting, offering or distributing a good or service by soliciting consumers within the definition of California *Business and Professions Code* § 17200 *et seq*.

## IV.   THE LAW REGARDING SDIRAS

26.    SDIRAS allow non-traditional investments and require the use of a Custodian to "administer" the account.

27.    A stark contrast exists, however, between the "administration" performed by trustees and custodians of SDIRAs, as compared to the "administration and management" performed by the trustees and custodians of traditional IRAs.  Because of their complexity, very few large investment companies or banks will administer SDIRAS.

28.    The trustees and custodians of traditional IRAs are considered fiduciaries of the IRA account such that they are responsible for maintaining and managing the securities in the IRA account, keeping track of distributions and dividend income, and making sure everything is done properly, legally and correctly.

29.    Custodians of SDIRAS, however, deny any type of fiduciary responsibilities even though they receive significant fees for administering an SDIRA.

30.    SDIRA Custodians do in fact have some duties, even though they frequently attempt to argue otherwise.  There are several regulatory requirements for SDIRA Custodians and SDIRA transactions under the Internal Revenue Code.

a.    First and foremost, SDIRA Custodians and Administrators are considered "passive" because they are *prohibited* from offering investment advice; they may act solely as conduits through which SDIRA accounts are administered. Pursuant to 26 C.F.R. 1.408-2 (e)(6), a SDIRA Custodian or trustee is passive   only if under the written trust instrument the trustee has no discretion to direct the investment of the trust funds or any other aspect of the business administration of the trust, but is merely authorized to acquire and hold particular investments specified by the trust instrument.

31.    With regard to their administration and custodial duties, SDIRA Custodians are required to maintain custody of the paperwork proving ownership of a designated asset by the SDIRA.  *See* 26 C.F.R. 1.408-2 (e) (6).

32.    SDIRA Custodians are also required to report the fair market value of the SDIRA assets annually on IRS Form 5498 and to report the value of any distributions to the SDIRA owner on Form 1099-R.  See Internal Revenue Manual Section 4.72.18.3.3 (11)

33.    IRS Publication 590 requires that a SDIRA:

a.    be a trust or custodial account set up in the United States for the exclusive benefit of  the owner and beneficiaries.  The  SDIRA account is created by a written document; and

b.    the SDIRA document must show that the SDIRA trustee or custodian is a bank, a federally insured credit union, a savings and loan association, or an entity approved by the IRS to act as trustee or custodian.

34.    Compliance for a transaction is determined by analyzing the definitions regarding: (a) who can be a SDIRA Custodian; (b) who may receive SDIRA investment monies; and (c) what investments are permitted.

35.    A "Disqualified Person" under Internal Revenue Code Section 4975 (e) (2) extends to a variety of persons, including the SDIRA owner, an owner of 50% or more of the investment entity receiving the SDIRA funds, the investment sponsor, and persons providing services to the SDIRA (the SDIRA Custodian).

36.     A "Direct Prohibited Transaction" pursuant to Internal Revenue Code § 4975 involves the direct or indirect sale, exchange, or leasing of property, the direct or indirect lending of money, and the direct or indirect providing of goods or services between a SDIRA and a "Disqualified Person." A Direct Prohibited Transaction also includes the direct or indirect transfer of income by a SDIRA to a "Disqualified Person."

37.     Disqualified persons are required by 26 U.S.C. § 4975 to file Form 5330s when it is learned that a SDIRA has engaged in a Direct Prohibited Transaction.  This notification triggers the tax penalties and other sanctions associated with Prohibited Transactions.  Among other negative consequences, Internal Revenue Code Section 4975 (a) imposes a fifteen percent (15%) tax on the amount involved in any Prohibited Transaction involving a Disqualified Person.  Further, SDIRAS with Prohibited Transactions cease to be SDIRAS at all, (retroactively) as of the first day of the calendar year the Prohibited Transaction occurs pursuant to 26 U.S.C. § 408(e)(2)(A).  Therefore the fair market value of the SDIRA will be considered fully distributed and the account holder will be taxed accordingly.

38.     SDIRAS also impose certain withdrawal requirements on these accounts.  For example, the IRS requires that IRA owners withdraw at least a minimum amount, known as a Required Minimum Distribution ("RMD") from their retirement accounts annually, starting the year an investor turns age 70 ½.  Thus the RMD requirement demands that retirement assets have a certain degree of liquidity.  RMDs vary based on the ages of the investor and beneficiary, as well as the rate of return earned on the investment.

## IV. PROVIDENT TRUST'S POLICIES, PROCEDURES, COMMISSIONS, AND OMISSIONS

39.     PROVIDENT TRUST failed and refused to comply with or abide by the regulatory requirements applicable to SDIRA Custodians in the rendition of their purported services to Plaintiff and other Class Members (including, for example, associating with persons who Defendants knew were "Disqualified Persons" such as BAE and KABAJOUZIAN, impliedly if not explicitly endorsing investments with such Disqualified Persons).  Defendants also failed to

disclose to Plaintiff and other Class Members that their PROVIDENT TRUST SDIRA was subject to penalties due to the Prohibited Transaction with BAE and KABAJOUZIAN.

40.     PROVIDENT TRUST failed and refused to maintain documents establishing the ownership of the real estate assets in their customers' SDIRAs purchased from BAE and KABAJOUZIAN and, in fact, never accurately identified or verified the identity of the assets and title to real estate investments purportedly owned by the SDIRAs of Plaintiff and the Class Members which PROVIDENT TRUST was mandated to procure as the SDIRA Custodian.

41.     Although PROVIDENT TRUST charged significant fees for its "administrative services," PROVIDENT TRUST failed to perform one of the few "duties" they acknowledge exists for custodians of SDIRAs: to maintain custody of the paperwork proving ownership of a designated asset by the SDIRA.  See 26 C.F.R. §1.408-2 which requires custodians to have the authority to hold title to SDIRA assets.

42.     As discussed above, SDIRA Custodians are supposed to be passive to avoid conflicts of interest, self-dealing, and taking advantage of investors.  Pursuant to 26 C.F.R. 1.408-2 (e)(6), a SDIRA Custodian or trustee is a passive trustee only if under the written trust instrument the trustee or Custodian has no discretion to direct the investment of the trust funds or any other aspect of the business administration of the trust, but is merely authorized to acquire and hold particular investments specified by the trust instrument.

43.     PROVIDENT TRUST'S policy and practice was to act outside of its alleged "passive custodian" capacity by jointly promoting its SDIRA custodial services with illegal investment schemes by Fraud Promoters like KABAJOUZIAN.

44.     PROVIDENT TRUST benefitted from KABAJOUZIAN'S Ponzi schemes because KABAJOUZIAN targeted victims with large retirement accounts that could be transferred to SDIRAS with PROVIDENT TRUST so PROVIDENT TRUST gained new clients and additional revenue while KABAJOUZIAN was able to steal not only the cash of his victims but also the monies in their retirement accounts.

## V. **DEFENDANTS' FRAUDULENT COMMON ENTERPRISE**

45.     KABAJOUZIAN launched BAE in 2008 and began selling investments in real estate in various states which had purportedly been "rehabbed" by BAE and then rented.  BAE guaranteed investment returns of at least 15%.

46.     KABAJOUZIAN and BAE were neither licensed nor registered to sell securities. The purported "investments" KABAJOUZIAN and BAE offered were neither licensed nor registered.

47.     KABAJOUZIAN is no stranger to California securities regulators.  In December of 2010, the State of California Corporations Commissioner issued a cease and desist order to KABAJOUZIAN and others arising from the sale of illegal, unregistered securities in mortgages, real estate, trust deeds, etc. Pursuant to that order, KABAJOUZIAN was to cease selling illegal securities as well as cease representing himself as a licensed investment advisor/broker. KABAJOUZIAN chose to do neither.

48.     On or about May of 2011, BAE and KABAJOUZIAN launched BAYAREASELFDIRECT.COM as an affiliate of MY SELF DIRECT selling PROVIDENT TRUST SDIRA services **and** illegal investments to its customers.

49.     BAE, MY SELF DIRECT and KABAJOUZIAN sold PROVIDENT TRUST'S SDIRA Custodian/Administrator services to third parties including Plaintiff and the Class members.

50.     BAE and MY SELF DIRECT could not serve as a SDIRA Custodian on their own because neither entity was licensed or registered as a custodial bank or trust company so all SDIRA accounts that they "sold" were administered by PROVIDENT TRUST.  It is unknown how much compensation BAE and MY SELF DIRECT received from PROVIDENT TRUST for each "sale" of SDIRA services.

51.     PROVIDENT TRUST and MY SELF DIRECT developed and provided all SDIRA marketing materials, SDIRA forms, and the "touch and feel" for the BAYAREASELFDIRECT.COM website which mirrors the "touch and feel" of the MY SELF DIRECT website whose content is copyrighted by PROVIDENT TRUST.

52.     PROVIDENT TRUST and MY SELF DIRECT provided the forms, "know-how" and information necessary for BAE, KABAJOUZIAN, and BAYAREASELFDIRECT.COM to sell PROVIDENT TRUST'S SDIRA services and illegal securities to Plaintiff and the Class Members.

53.     KABAJOUZIAN and BAE (the investment sponsors) sold phantom real estate investments, made through cash and SDIRA investments, for the purchase of real property that BAE never owned or held title to.

54.     Each of the transactions consummated for the purchase of the phantom real estate from BAE through a PROVIDENT TRUST SDIRA was a Prohibited Transaction because BAE and KABAJOUZIAN were "Disqualified Persons" and therefore were prohibited from receiving SDIRA monies. Something PROVIDENT TRUST knew, but the Plaintiff and Class Members did not.

55.     As a result, each of the PROVIDENT TRUST SDIRAS of the Plaintiff and other Class Members was void from inception as a Prohibited Transaction.

56.     PROVIDENT TRUST and MY SELF DIRECT gave BAE and KABAJOUZIAN purposefully gave credibility with potential cash investors and potential SDIRA customers/investors like Plaintiff and the Class Members who otherwise might have been skeptical of BAE and KABAJOUZIAN.

57.     BAE and KABAJOUZIAN were able to "sign up" Plaintiff and the Class Members for PROVIDENT TRUST SDIRAS with literally no supervision or oversight by PROVIDENT TRUST. PROVIDENT TRUST literally had to do nothing but collect its very expensive Custodian fees.

58.     Through their affiliation with PROVIDENT TRUST and MY SELF DIRECT, KABAJOUZIAN and BAE were able to gain the trust and confidence of their targets/victims including the Plaintiff and Class Members and gain access not only to their cash but also to their retirement savings.

59.     After Plaintiff and the other Class Members transferred their retirement monies into PROVIDENT TRUST SDIRAS, their SDIRA monies were then supposed to be wired by

PROVIDENT TRUST to accounts owned and/or controlled by VANGUARD so that VANGUARD could consummate the purchase of the "rehabbed property" from BAE.

60.     VANGUARD was responsible for handling the closing of the real estate purchase transaction, the transfer of title to the property, and all other administrative tasks necessary to transfer title of the properties from BAE to the PROVIDENT TRUST SDIRAS of Plaintiff and the Class Members or to the name of the Plaintiff and Class Members individually if it was a cash purchase.

61.     It is unknown at this time whether VANGUARD did not receive the SDIRA monies from PROVIDENT TRUST or cash transfers from the Plaintiff and Class Members and instead the funds were diverted to accounts controlled by KABAJOUZIAN and BAE; or, whether VANGUARD actually received the SDIRA monies or cash transfers from Plaintiff and the Class Members and then VANGUARD diverted the funds to KABAJOUZIAN and BAE.

62.     However, what is clear is that VANGUARD was responsible for transferring title to real property to Plaintiff and the Class Members that was allegedly owned by BAE. VANGUARD failed to transfer title to Plaintiff and Class Members or their SDIRAS and VANGUARD failed to disclose to Plaintiff and the Class Member that BAE didn't own the property that was the subject of the transaction.

63.     Nevertheless, once VANGUARD consummated the sale of the real estate investments to be held by the PROVIDENT TRUST SDIRAS then VANGUARD was supposed to forward the recorded title to the property to the SDIRA Custodian PROVIDENT TRUST for safe-keeping.

64.     Once VANGUARD consummated the real estate purchase for each cash transaction, VANGUARD was supposed to forward the recorded title to the real property to its lawful owner, Plaintiff and the Class Members.

65.     **However, VANGUARD never consummated any real estate purchases or recorded the title for any of the properties that were supposed to be purchased by Plaintiff and the Class Members through PROVIDENT TRUST SDIRAS or with cash.**

66.     PROVIDENT TRUST and VANGUARD facilitated, aided, abetted and concealed the fraud of BAE and KABAJOUZIAN which resulted in Plaintiff and the Class Members investing cash and SDIRA monies in phantom real estate that BAE never owned.   Without the direct assistance of PROVIDENT TRUST and VANGUARD, BAE and KABAJOUZIAN could not have stolen the monies of Plaintiff and the Class Members.

## VI.   DEFENDANTS' INTERACTIONS AND RELATIONSHIPS WITH THEIR INVESTORS/CLIENTS

67.     Some of the nontraditional investment options for SDIRA accounts include tax lien certificates, promissory notes, real estate, businesses, and LLCs.

68.     At the urging of KABAJOUZIAN and BAE, Plaintiff and the Class Members unknowingly invested in fraudulent investment schemes through SDIRAS.

69.     KABAJOUZIAN and BAE could not have obtained the monies in the retirement accounts of the Plaintiff and the Class Members without using a SDIRA, since that is the only investment vehicle that permits unregulated, non-traditional investments.

70.     KABAJOUZIAN and BAE were not legitimate investment advisers but instead sought to defraud Plaintiff and the Class Members by acting in a dual role of investment sponsor and SDIRA Record keeper/Administrator (in violation of law, including Internal Revenue Code § 4975).

71.     KABAJOUZIAN and BAE mandated that Plaintiff and the Class Members invest in SDIRAS using PROVIDENT TRUST as the Custodian since KABAJOUZIAN and BAE received compensation for referring Plaintiff and the other Class Members to MY SELF DIRECT and PROVIDENT TRUST.

72.     KABAJOUZIAN was acutely aware that his affiliation with MY SELF DIRECT and PROVIDENT TRUST and use of PROVIDENT TRUST as a SDIRA Custodian provided a sense of legitimacy to an otherwise fraudulent investment scheme.

73.     This affiliation allowed KABAJOUZIAN and BAE to entice inexperienced and unsophisticated investors (who might otherwise be more cautious) into an investment scam because

they believed they were protected by large, purportedly well-funded companies with trustworthy names like "PROVIDENT TRUST "

74.     PROVIDENT TRUST benefitted from KABAJOUZIAN'S fraudulent scheme by receiving thousands of dollars in SDIRA Custodian fees from the Plaintiff and other Class Members.

75.     PROVIDENT TRUST insulated itself from potential liability (or attempted to), *inter alia*, by employing complex non-negotiable, form contracts which purportedly limit its liability to its customers for virtually any and all situations.

76.     Another strategy employed by PROVIDENT TRUST to seek insulation from liability (for both KABAJOUZIAN and BAE'S fraud and as well as the other Defendants' active concealment of KABAJOUZIAN and BAE'S fraud) is to simply keep quiet and wait. PROVIDENT TRUST never disclosed that the SDIRAS of the Plaintiff and Class Member contained no identifiable, verifiable assets or recorded title to real property.  PROVIDENT TRUST simply maintained the SDIRAS of the Plaintiff and other Class Members in their status quo to avoid scrutiny and waited for the statute of limitations to run on potential claims, leaving Plaintiff and the other Class Members without a remedy.

77.     Although PROVIDENT TRUST charged significant fees for its "administrative services," it also failed to perform one of the few "duties" it acknowledges exists for custodians of SDIRAS: to identify the SDIRA asset(s), maintain custody of the SDIRA asset(s) (indicia of ownership), and verify the identity of the SDIRA asset(s).

## VII.   DEFENDANTS' KNOWLEDGE OF MATERIAL FACTS AND PLAINTIFF'S LACK OF KNOWLEDGE

78.     Obviously the fact that Plaintiff's  and Class Members' monies were being stolen and were being used in a Ponzi scheme through the sale of  unregistered, illegal securities

79.     Obviously the fact that Plaintiff's  and Class Members' monies were being stolen and were being used in a Ponzi scheme through the sale of  unregistered, illegal securities by

unlicensed investment promoters were material facts which Defendants knew about, but Plaintiff and the Class Members did not.

80.    The fact that Plaintiff's and the Class Members' SDIRA monies and cash were used to purchase phantom real estate that BAE never owned were material facts which Defendants knew about but Plaintiff and the Class Members did not.

81.    The fact that the Plaintiff's and the Class Members' SDIRA investments were Prohibited Transactions and were therefore illegal was another material fact that Defendants had actual knowledge of but Plaintiff and the other Class Members did not.

82.    The fact that Plaintiff and the Class Members paid for SDIRA Custodian services that either were never performed or were out of compliance was yet another material fact known to Defendants but unknown to Plaintiff and the Class Members.

83.    Plaintiff and the Class Members were entitled by law to know the annual fair market value of their PROVIDENT TRUST SDIRAS. PROVIDENT TRUST failed and refused to disclose this information to Plaintiff and the other Class Members.

84.    PROVIDENT TRUST could not or would not provide fair market valuations for the properties purportedly held in the SDIRAS of the Plaintiff and Class Members because then PROVIDENT TRUST would have been forced to disclose that the SDIRAS of the Plaintiff and Class Members did not hold title to any property or assets. Such a disclosure by PROVIDENT TRUST would have alerted Plaintiff and the Class Members that BAE and KABAJOUZIAN were conducting a fraudulent investment scheme with the help of VANGUARD and PROVIDENT TRUST.  If PROVIDENT TRUST had disclosed the existence of the fraudulent scheme by BAE and KABAJOUZIAN, then Plaintiff and the Class Members would not have invested any further cash or SDIRA monies with BAE and KABAJOUZIAN, which would in turn have resulted in VANGUARD, PROVIDENT TRUST, BAE AND KABAJOUZIAN not receiving any further fees from Plaintiff and the Class Members.  This was another example of PROVIDENT TRUST failing to perform its regulatory duties as the SDIRA Custodian and another material fact which was not disclosed to the Plaintiff and Class Members.

85.     PROVIDENT TRUST not only knew the duties, obligations, and requirements of SDIRA Custodians that it was required to abide by, but also actively avoided and circumvented those duties, obligation and requirements.

## VII.   PLAINTIFFS' RELIANCE ON DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS

86.     Plaintiff and the Class Members relied upon the representations (more accurately described as omissions and misrepresentations) of Defendants in many ways, including the decision to invest in the first place as well as the decision to make additional investments.

87.     PROVIDENT TRUST gave Plaintiff and the Class Members a false sense of security by making false and deceptive representations that made Plaintiff and the Class Members believe that their "investments" were safe with "trust" companies and properly administered by PROVIDENT TRUST.

88.     VANGUARD gave Plaintiff and the Class Members a false sense of security by making false and deceptive representations that VANGUARD would properly administer the real estate transactions necessary to acquire the real property to be held by the SDIRAS of Plaintiff and the Class Members or by Plaintiff and the Class Members individually.

89.     Plaintiff and the Class Members, relying on those representations, tendered their hard-earned money to Defendants, while Defendants facilitated fraud through a common enterprise resulting in the loss of their monies (frequently their entire life savings).

90.     Plaintiff relied upon the expectation (and in fact the law) that if the other party to a contract (here Defendants) makes an affirmative representation, that representation will be truthful and complete.  Since KABAJOUZIAN and BAE were affiliates of PROVIDENT TRUST and MY SELF DIRECT and actually worked for both signing up new SDIRA customers, there was no reason for the Plaintiff or Class Members to be suspicious.  On the contrary, since large returns were promised and PROVIDENT TRUST and MY SELF DIRECT implicitly if not explicitly endorsed the investments by jointly marketing their services together, the Plaintiff and Class Members had no reason to hesitate before investing.

91.    Plaintiff and Class Members also relied upon Defendants to undertake the necessary steps to satisfy the IRS requirements, such as providing fair market value of assets using qualified third parties.

92.    PROVIDENT TRUST'S failure to accurately report the value of the SDIRAs of Plaintiff and the Class Members resulted in Plaintiff and the Class Members being unaware that their investment monies had actually been stolen even though their SDIRAS appeared to be increasing in value or were stable.

93.    PROVIDENT TRUST operated behind a façade that it was a large, well-established, cohesive compliant SDIRA Custodian/Administrator.  Together, Defendants created the illusion that SDIRAs investments as well as cash investments with BAE and KABAJOUZIAN would greatly increase in value and that the investments were profitable and legitimate.

94.    Plaintiff and Class Members relied on the misrepresentations and omissions of the Defendants: (a) in deciding to make their investment in the first place; (b) in deciding not to withdraw funds or close an account; (c) in handling their tax liabilities and required distributions; (d) in deciding to invest more money or   reinvest or simply leave their money in their PROVIDENT TRUST SDIRA based on the false impression of receiving a much better return than any alternative investment opportunity or at least not losing value like the stock market.

95.    Although PROVIDENT TRUST claimed to be a "passive Custodian," PROVIDENT TRUST acted outside of its alleged  "passive custodian" capacity by:

> a.   Jointly marketing its SDIRA custodial services with BAE and KABAJOUZIAN's investment schemes;
>
> b.   Failing to disclose that BAE and KABAJOUZIAN'S investments were fraudulent and that the PROVIDENT TRUST SDIRAS of the Plaintiff and other Class Members were worthless and held no assets.
>
> c.   Permitting KABAJOUZIAN and BAE to open PROVIDENT TRUST SDIRAS where the only "asset" was documentation evidencing an "intent" to purchase real property but actually consisting of no assets or evidence of title to assets.

d.   Having actual knowledge of the illegality of a PROVIDENT TRUST SDIRA or knowing that a PROVIDENT TRUST SDIRA was void under the IRC yet failing to disclose said information to PROVIDENT TRUST clients to conceal the fraud of BAE and KABAJOUZIAN and keep the PROVIDENT TRUST SDIRA account open.

e.   Having actual knowledge that PROVIDENT TRUST and MY SELF DIRECT affiliates and agents were soliciting illegal investments to be placed through PROVIDENT TRUST SDIRAS and concealing that information from PROVIDENT TRUST SDIRA customers.

f.   Failing to file Form 5330 disclosures with the IRS upon learning that a PROVIDENT TRUST had consummated a Prohibited Transaction.

g.   Failing to disclose to Plaintiff and other Class Members that their PROVIDENT TRUST SDIRA was subject to penalties of 100% or more of the amount involved in the Prohibited Transaction.

**A.   Plaintiff ANTONIA LONERGAN**

96.   In March of 2012, Plaintiff ANTONIA LONERGAN ("LONERGAN") was looking for real estate investment opportunities. LONERGAN was on total permanent disability and was looking to invest in real estate that would provide her with adequate income, along with her Social Security Disability Income, to cover her living expenses.

97.   In March of 2012, Plaintiff ANTONIA LONERGAN ("LONERGAN") was looking for real estate investment opportunities. LONERGAN was on total permanent disability and was looking to invest in real estate that would provide her with adequate income, along with her Social Security Disability Income, to cover her living expenses.

98.   LONERGAN had an IRA with Vanguard but it was not performing well due to the downturn in the stock market at that time.

99.   LONERGAN found an advertisement for BAE on Craigslist.org which advertised rehabbed real estate investment properties with guaranteed returns of at least 15%.

100.     LONERGAN clicked on the link in the Craigslist.org ad which took her to the BAE website, www.bayareaequitygroup.com.  LONERGAN filled out the information on the website to order a "Free Investment Starter Kit" from BAE.

101.     Subsequently, LONERGAN received a call from Dee Ramirez ("Ramirez") who worked as a sales representative for BAE.  LONERGAN was living in Oakland, California at the time so she decided to go visit BAE's offices in Campbell, California and meet with Ramirez and KABAJOUZIAN personally.

102.     In April of 2012, LONERGAN went to the BAE offices.   Ramirez and KABAJOUZIAN told LONERGAN that they had several properties in Detroit, Michigan that were already rehabbed and that LONERGAN would receive rent guarantees of at least 15% from BAE for the properties if she purchased them.

103.     Ramirez and KABAJOUZIAN explained to LONERGAN that she could purchase the BAE properties through a SDIRA.  LONERGAN was not familiar with SDIRAS but Ramirez and KABAJOUZIAN explained the process to her, told her they would take care of opening a SDIRA for LONERGAN, and then LONERGAN could transfer the funds she had in her Vanguard retirement account to the SDIRA in order to purchase the BAE properties. Ramirez and KABAJOUZIAN told LONERGAN that they would pay any set up fees for the SDIRA.

104.     During this same meeting, LONERGAN told RAMIREZ and KABAJOUZIAN that she wanted to sell her home in Oakland and move to the Sacramento area.

105.     LONERGAN advised Ramirez and KABAJOUZIAN that she was on total permanent disability and that she needed income-producing real estate investments to cover her living expenses.  LONERGAN indicated to Ramirez and KABAJOUZIAN that she might want to invest some of the proceeds left from the sale of her Oakland home with BAE after she purchased a new home in Sacramento which she intended to pay cash for.

106.     KABAJOUZIAN told LONERGAN that he had a real estate company, Infinity Realty, that could sell LONERGAN'S Oakland home and he would reduce the real estate commission for the sale from 3% to 1.5%.

107.     LONERGAN took home the information package that KABAJOUZIAN and Ramirez gave her and reviewed it. LONERGAN also did an online search on BAE to see if there were any complaints or negative information about BAE and found none.

108.     LONERGAN then contacted Ramirez and advised her that LONERGAN was ready to move forward with the BAE real estate investment.   On April 24, 2012, Ramirez emailed LONERGAN a BAE/MYSELFDIRECT/PROVIDENT TRUST SDIRA application. Ramirez had completed the entire SDIRA application so all LONERGAN had to do was sign it.

109.     The cover page of the BAE/MYSELFDIRECT/PROVIDENT TRUST SDIRA application had the name "BAY AREA SELF DIRECT" at the top of it with the same logo as BAE (a drawing of a bay bridge).  The bottom footnote on the SDIRA application cover page indicated that the application was being completed to obtain SDIRA services from PROVIDENT TRUST.

110.     On the first page of the BAE/MYSELFDIRECT/PROVIDENT TRUST SDIRA application, there was a Las Vegas, Nevada address at the top left corner with an 800 phone number of 800-447-3930. This 800 phone number is the customer service phone number for MY SELF DIRECT and the address is the corporate address for PROVIDENT TRUST.

111.     The Fee Schedule for the BAE/MYSELFDIRECT/PROVIDENT TRUST SDIRA application was titled as "BAYAREASELFDIRECT C/O PTG."  "PTG" refers to PROVIDENT TRUST GROUP.  The Fee Schedule has a footer reference "CA3010039-05.11." In addition, there is an asterisk by the fees for "IRA LIMITED LIABILITY COMPANY" which references a footnote on the fee schedule which states in part: "LLC fees are directly assessed by MYSELFDIRECT."

112.     The Direction of Investment pages on the BAE/MYSELFDIRECT/PROVIDENT TRUST SDIRA application that LONERGAN executed were left blank in the areas where who the investment was to be paid to and the wire transfer information were located.

113.     On the application, Ramirez had listed BAE as the Agent for LONERGAN'S SDIRA and checked a box permitting BAE to access LONERGAN'S SDIRA account and obtain account status and transaction information.

---

CLASS ACTION COMPLAINT                    19

114. In May of 2012, LONERGAN received four completed Direction of Investment forms for her signature evidencing the purchase of four pieces of property all in Detroit, Michigan. LONERGAN'S PROVIDENT TRUST SDIRA was purchasing these properties from BAE for a total purchase price of approximately $151,000.

115. Because LONERGAN did not have sufficient funds in her SDIRA to cover the total purchase price of all four pieces of property, BAE provided LONERGAN with a mortgage for approximately $16,000. All rent payments received from the SDIRA investment properties were to be deposited in LONERGAN'S SDIRA after payment of $1500 per month to BAE for the mortgage on LONERGAN'S investment properties and approximately $300 per month for property insurance.

116. The four Direction of Investment ("DOI") forms that LONERGAN received were virtually identical except for the description of property to be purchased by the SDIRA and the purchase price.

117. The DOIs stated that LONERGAN'S SDIRA was purchasing real estate, gave the address of the real estate being purchased and also provided that PROVIDENT TRUST was to execute the closing documents on behalf of LONERGAN'S SDIRA.  Interestingly, the vesting for the investment documents in the DOIs was titled as "PROs/DEE d TRUST GROUP, LLC FBO YOUR NAME /RA" which was different from the vesting for the investment documents contained in the DOI in the initial application LONERGAN signed which stated that vesting was to be titled in "PROVIDENT TRUST GROUP, LLC FBO Your Name IRA."

118. The DOIs indicated that LONERGAN'S SDIRA monies were to be wired to a VANGUARD account at Fifth Third Bank.

119. VANGUARD'S Buyer/Borrower Statement described the "buyer" as PROVIDENT TRUST GROUP LLC FBO ANTONIA D. LONERGAN IRA."

120. With each DOI, LONERGAN received: a VANGUARD Buyer/Borrower Statement, a Water Bill Hold Harmless form prepared by VANGUARD, a Property Transfer Affidavit/Homestead Exemption Report," a signature page indicating that the buyer and seller had approved an HUD-1 disclosure statement on the property (which LONERGAN never received or

reviewed), and a Warranty Deed drafted and signed by KABAJOUZIAN on behalf of BAE with a separate notary page for KABAJOUZIAN's signature.

121.    LONERGAN'S Vanguard retirement account monies were wired to a PROVIDENT TRUST bank account on May 29, 2012.

122.    LONERGAN'S SDIRA was charged an annual fee of $345, a fee of $100 for each of the four pieces of property purchased by LONERGAN'S SDIRA as well as $100 "Consulting Fee," a $50 set-up fee and a $10 check fee for each of the four checks written to purchase the properties.

123.    Then in June of 2012, LONERGAN received additional documents from Ramirez for the purchase of the four pieces of property in Detroit.  Ramirez told LONERGAN that VANGUARD had made a mistake on "the numbers" and therefore her real estate transaction documents had to be revised.

124.    In the package from Ramirez was a Federal Express label to overnight the documents to Cami Saldana at VANGUARD. For the four properties to be purchased there was: a "Property Transfer Affidavit," a Water Bill Hold Harmless Agreement, an "Offer to Purchase Real Estate," "General Conditions" and a "Buyer/Borrower" statement.  Also enclosed was a "Revised Form of Mortgage" for the $16,000 that LONERGAN was borrowing from BAE.

125.    After executing these documents from BAE and sending them to VANGUARD, LONERGAN did not hear anything else from BAE or PROVIDENT TRUST so she assumed the four real estate purchase transactions by her PROVIDENT TRUST SDIRA were successfully completed.

126.    By October of 2012, LONERGAN had sold her home in Oakland, purchased a home and moved to Sacramento and was interested in investing the remaining proceeds of the sale of her Oakland home with BAE.

127.    Subsequently, $150,000 from the proceeds of the sale of LONERGAN'S Oakland home was sent to VANGUARD for the purchase of three additional properties in Detroit from BAE that Ramirez had recommended.  The total cash purchase price for the three properties was $143,000 so LONERGAN received $7000 back from VANGUARD.

128.   For these cash transactions, LONERGAN signed the transaction documents on line except for the Property Transfer Affidavits which LONERGAN signed manually and sent to BAE.

129.   Around September of 2012, LONERGAN became concerned because she had not received property tax bills for the four properties she had purchased through her PROVIDENT SDIRA.  LONERGAN contacted KABAJOUZIAN'S assistant, Lisa Nava ("Nava"), who advised LONERGAN that she would look into it. LONERGAN did not hear anything further from Nava so she contacted Ramirez.  Ramirez advised LONERGAN that the City of Detroit did not send out tax bills until the end of the year and that Detroit was behind on sending out property tax bills. LONERGAN was relieved.

130.   Then in February of 2013, LONERGAN decided to check the status of and balance in her PROVIDENT SDIRA account. LONERGAN logged into her account and for the first time learned that BAE had not been depositing rent payments for her four Detroit properties into her PROVIDENT TRUST SDIRA.

131.   LONERGAN contacted KABAJOUZIAN who assured her it was a mere oversight and he would resolve it. After that some small rent payments began to trickle into to LONERGAN'S SDIRA but LONERGAN was becoming increasing suspicious about BAE and KABAJOUZIAN.

132.   LONERGAN thought that perhaps BAE and KABAJOUZIAN were stealing the rent payments on her properties.  LONERGAN started asking BAE representatives about the rent payments for the properties she had purchased with  cash, and the status of insurance coverage for all of the properties.

133.   In early March of 2013, LONERGAN reviewed her PROVIDENT TRUST SDIRA statement for calendar year 2012.  The PROVIDENT TRUST SDIRA statement indicated that LONERGAN'S SDIRA had a market value of over $135,000 and listed as assets the four property addresses in Detroit that PROVIDENT TRUST had purchased for her SDIRA. In addition, LONERGAN'S SDIRA statement indicated that the PROVIDENT TRUST had received $633 in rent payments for the four Detroit properties and that the SDIRA had paid PROVIDENT TRUST $1700 in fees in 2012.

134.   Around this same time, LONERGAN spoke to an attorney about the situation with BAE and her concern about the status of her Detroit investment properties. The attorney advised LONERGAN to hire her own real estate management company to manage the seven rental properties in Detroit and collect the rents.

135.   Around March 12, 2012, LONERGAN contacted BAE and requested a copy of the recorded deeds for all of her Detroit properties. However, no one at BAE responded.

136.   Thereafter LONERGAN contacted a real estate management company in Detroit. A company representative told her that they needed a copy of the recorded deeds on her seven Detroit rental properties.

137.   Around that same time, LONERGAN also contacted VANGUARD and requested a copy of the recorded deeds for all seven properties.  LONERGAN was advised that her files were in storage and they would have to be retrieved.

138.   On March 20, 2013, LONERGAN retained DuBose Realty Group ("DuBose") to manage her Detroit rental properties.

139.   Immediately thereafter, representatives of DuBose advised LONERGAN that the deeds titling the property to LONERGAN and LONERGAN'S SDIRA were never recorded.  Cami Saldana ("Saldana"), an employee of VANGUARD, thereafter confirmed with LONERGAN that none of the seven deeds were ever recorded by VANGUARD but Saldana claimed it was because all of the properties owed either back taxes for 2012, delinquent water bills and/or delinquent waste bills. Saldana referred to the matter as an "oversight" by VANGUARD and apologized.

140.   Yet Saldana had no explanation as to why VANGUARD had never notified LONERGAN that the properties had delinquent taxes and bills and that VANGUARD had never recorded the deeds. Nevertheless, Saldana assured LONERGAN that once the back taxes and delinquent bills were paid for the seven properties, Saldana would record all of the deeds. LONERGAN attempted to contact Saldana and VANGUARD thereafter to follow up but LONERGAN received no response.

141.   At this point in time, LONERGAN still thought she owned the Detroit properties but that the deeds had simply not been recorded so she started making arrangements to get the back

1   taxes and delinquent bills paid on all of the properties as well as making arrangements to procure

2   insurance.

3       142.   However, a representative of DuBose soon contacted LONERGAN and advised her

4   that they had inspected the seven properties and that ALL of the properties were in a state of

5   disrepair such that they were uninhabitable. DuBose estimated it would cost thousands of dollars to

6   make the seven rental properties that LONERGAN had invested in habitable. LONERGAN was in

7   shock.

8       143.   LONERGAN again contacted BAE and was told that BAE would have the

9   properties inspected and repaired. In fact, KABAJOUZIAN personally assured LONERGAN that

10  all of the properties had previously had tenants and that 80% of her properties were rented!

11  KABAJOUZIAN also tried to convince LONERGAN to utilize BAE'S management company

12  instead of DuBose for the Detroit properties but LONERGAN refused. After that, LONERGAN

13  never heard from BAE again.

14      144.   In the meantime, LONERGAN on a hunch started researching the county records

15  for her Detroit properties.  To her shock and dismay, LONERGAN learned that none of the

16  properties that LONERGAN thought she had purchased with cash and none of the properties that

17  LONERGAN thought PROVIDENT TRUST had purchased through LONERGAN'S SDRIA were

18  actually owned by BAE at the time of the purported "sale" to LONERGAN and LONERGAN'S

19  SDIRA.

20      145.   LONERGAN could not understand how VANGUARD could have processed the

21  seven real estate transactions with BAE when VANGUARD knew that BAE did not own any of

22  the seven properties because BAE was not listed in public records as a title holder for any of the

23  properties. And LONERGAN could not understand why PROVIDENT TRUST had not alerted her

24  that they never received the recorded title to any of the four properties held by LONERGAN'S

25  SDIRA.

26      146.   In early April of 2013, LONERGAN sent an email to Michael Salcido ("Salcido")

27  who was LONERGAN'S representative at PROVIDENT TRUST.  LONERGAN had previously

28  received Salcido's name after calling the 800 number for MY SELF DIRECT on LONERGAN'S

SDIRA application to inquire about the problems with her investments and was given Salcido's name and contact information by a representative of MY SELF DIRECT.

147.   LONERGAN contacted Salcido and told him that she had learned that her SDIRA did not own the properties, that all of the transactions were a fraud and that she did not want PROVIDENT TRUST to pay any taxes, bills or expenses for any of the properties. Salcido told LONERGAN he would put a freeze on her account and notify the Compliance Department at PROVIDENT TRUST about LONERGAN'S situation.

148.   LONERGAN emailed Salcido several times after that but received no response. Then on April 4, 2013, LONERGAN sent Salcido an email advising him that BAE through its website, BAYAREASELFDIRECT.COM, was soliciting consumers to open SDIRAS at PROVIDENT TRUST.  LONERGAN advised Salcido that BAE was a Ponzi scheme and that BAE was defrauding people by selling properties they didn't own over and over again.

149.   In response, Salcido advised LONERGAN that he had cancelled all tax payments and other payments for her four properties in her SDIRA.  However, Salcido advised LONERGAN that he had spoken to the PROVIDENT TRUST compliance department and they had advised him that **PROVIDENT TRUST "would need ..appraisal documents from your new management company showing no values in these (SDIRA) properties to properly devalue them in your IRA.**"

150.   A few days later, LONERGAN emailed Salcido and asked him if the PROVIDENT TRUST compliance department "will contact the proper authorities to report this theft."  Salcido never responded to LONERGAN'S question.

151.   To this day, LONERGAN does not know what happened to her PROVIDENT TRUST SDIRA assets or the real estate LONERGAN purchased from BAE with cash. If LONERGAN had known that PROVIDENT TRUST did not have a recorded title to the four properties that were supposed to be purchased by LONERGAN'S SDIRA, LONERGAN would not have invested an additional $143,000 with BAE.

152.   LONERGAN'S SDIRA statements failed to accurately reflect the fair market value of her SDIRA assets.  Despite its knowledge of the fraudulent activities of BAE, VANGUARD and

KABAJOUZIAN, PROVIDENT TRUST failed to disclose that: (a) KABAJOUZIAN and BAE (PROVIDENT TRUST'S agent) had sold Plaintiff and Class Members illegal securities; (b) their SDIRAS were illegal and void; (c) BAE, VANGUARD and KABAJOUZIAN had stolen the SDIRA assets; and (d) their SDIRA accounts were worthless (most contained only worthless pieces of paper as their only asset).

153. Since the inception of LONERGAN'S PROVIDENT TRUST SDIRA, PROVIDENT TRUST has failed to hold title to any asset in LONERGAN'S SDIRA. From May 2012 until the present, PROVIDENT TRUST was the SDIRA Custodian of nothing and LONERGAN still had to pay for the privilege of PROVIDENT TRUST'S services for administering her worthless PROVIDENT TRUST SDIRA.

## V.  CLASS ACTION ALLEGATIONS

154. Plaintiff brings this action on her behalf and as a class action pursuant to Rules 23(a) and (b) (3) of the Federal Rules of Civil Procedure on behalf of a class (the "KABAJOUZIAN Class") defined as all persons or entities who invested cash and/or held an investment through a SDIRA administered by Defendants from January 1, 2008 until the present (the "Class Period") and/or that was offered, sold or solicited by KABAJOUZIAN or any persons or entities related to him.

155. Excluded from the Class are: (a) Defendants; (b) Members of the immediate family of each of the Defendants that are not corporate entities; (c) any person who was an executive officer, employee and/or director or their spouse, child or parent of any Defendant during the Class Period; (d) any person, firm, trust, corporation, officer, director or any other individual or entity in which any Defendant has a controlling interest or which is affiliated with any of the Defendants; (e) any independent contractor of any Defendants who participated in the sale of the investment vehicles outlined herein; (f) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party; and (g) those persons who are named litigants or have opted in to a class of persons in litigation against these Defendants for similar claims

156.     The Class is so numerous that joinder of all Class Members is impracticable.  While the exact number of Class Members can only be determined by appropriate discovery, Plaintiff believes that the Class Members total over 50

157.     Plaintiff's claims are typical of the claims of the other Class Members.  Plaintiff and all Class Members sustained damages as a result of Defendants' unlawful course of conduct

158.     Plaintiff will fairly and adequately protect the interest of the Class Members and has retained counsel competent and experienced in class action litigation.  Plaintiff has no interests that are contrary to or in conflict with those of the Class Members that Plaintiff seek to represent

159.     A class action is superior to other methods for the fair and efficient adjudication of this controversy.  The expense and burden of individual litigation make it virtually impossible for the Class Members individually to seek redress for the wrongful conduct alleged herein.

160.     Common questions of law and fact exist as to all Class Members and predominate over any questions solely affecting individual Class Members.  Among the questions of law and fact common to the Class are:

      a.   Whether Defendants made false and misleading representations to Plaintiff and the Class;

      b.   Whether Defendants engaged in false, misleading and deceptive advertising;

      c.   Whether Defendants have violated California's Unfair Competition Law; and

      d.   Whether Plaintiff and the Class Members have sustained damages as a result of the misconduct complained of herein, and, if so, the appropriate measure thereof.

161.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

162.     The names and addresses of Class Members are obtainable from information in the possession of Defendants and/or their agents.  Notice can be provided to such owners via first class mail or e-mail using techniques and a form of notice similar to those customarily used in class actions.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT I**

**CONVERSION**

(Against All Defendants)

163.    Plaintiff incorporates the allegations contained in all of the prior paragraphs of this Complaint as if restated and fully set forth herein.

164.    As described more fully above, the "investment" programs concocted by KABAJOUZIAN that Plaintiff and the Class Members invested in, were bogus.  Defendants aided and abetted Ponzi Schemes and other fraudulent conduct that permitted KABAJOUZIAN to exercise unauthorized dominion and control over the property of Plaintiff and the Class Members.

165.    Defendants' conversion has permanently deprived Plaintiff and the other Class Members of their property, causing damage.

166.    Plaintiff and the Class Members have repeatedly demanded that their funds be returned but Defendants did not in fact return them.

167.    Defendants' actions have directly caused injury and damages to Plaintiff and the Class Members.

**COUNT II**

**INTENTIONAL FRAUD**

(Against KABAJOUZIAN)

168.    Plaintiff incorporates the allegations contained in all of the prior paragraphs as if restated and fully set forth herein.

169.    KABAJOUZIAN made several misrepresentations to the public at large and to Plaintiff and the Class Members as set forth above.  In particular he falsely stated that the "investments" made by Plaintiff and the Class Members would be safe, insured, accurately administered, and legally sound when in fact they were not.

170.    KABAJOUZIAN knew that these statements were false when he made them.

171.    KABAJOUZIAN intended for Plaintiff and the Class Members to rely upon their false statements.

172.   Plaintiff and the Class Members did rely on KABAJOUZIAN'S false statements, and would never have invested in and continued to invest in SDIRAS or in cash were it not for the false statements.

173.   KABAJOUZIAN has enjoyed substantial financial gain, and Plaintiff and the Class Members have suffered severe financial loss, as a result of these false statements.

## COUNT III

## INTENTIONAL FRAUD

(Against All Defendants)

174.   Plaintiff incorporates the allegations contained in all of the prior paragraphs as if restated and fully set forth herein

175.   Defendants concealed and/or suppressed material and true facts from the Plaintiff and Class Members, including that:

      a.   Their investments were not safe or secure;

      b.   Their investments were not insured and were not legally sound;

      c.   Their SDIRA accounts were not safe and were not properly administered;

      d.   PROVIDENT TRUST did not and would not obtain or properly maintain documents reflecting the nature of and title to assets held in their accounts;

176.   Defendants had a duty to their clients to disclose these materials facts.

177.   Defendants intended to defraud the Plaintiff and Class Members, which is why they concealed these facts.

178.   Plaintiff and Class Members would not have made the subject investments if they had known the truth.

179.   Plaintiff and the other Class Members have suffered damages as a result of the fraudulent concealment, including but not limited to the money in their SDIRA accounts being stolen,  the money they invested in cash being stolen and payment of fees for administering an account which held no assets (based on their having been stolen already).

# COUNT IV

## UNFAIR COMPETITION

### (Business and Professions Code § 17200 *et seq.*)

(Against all Defendants)

180.    Plaintiff incorporates the allegations contained in all of the prior paragraphs as if restated and fully set forth herein.

181.    Business and Professions Code § 17200, *et seq.*, prohibits acts of "unfair competition," including any unlawful, fraudulent or deceptive business act or practice, as well as "unfair, deceptive, untrue or misleading advertising."

182.    This private Attorney General action is brought by Plaintiff  on behalf of the Class to remedy violations of California's state consumer protection statutes arising out of Defendants' and/or their representatives' misrepresentations, omissions of material facts, and breaches of agreements.

183.    Defendants, at all times material hereto, have engaged in "trade or commerce" by advertising, soliciting, offering or distributing a good or service by soliciting consumers within the definition of Business and Professions Code § 17200 *et seq.*

184.    This is a private Attorney General action brought on behalf of the general public. As detailed herein, Defendants have engaged in a pattern and practice of uniformly misrepresenting and/or repudiating their contractual and legal obligations.

185.    Defendants' deliberate acts of fraud and misrepresentation accomplished through Ponzi schemes involving "investments" in illegal gambling activities, shell companies and ghost investment vehicles constitute acts of unlawful, unfair or deceptive business acts and practices that are injurious to the public within the meaning of California's Unfair Competition Law.

186.    Defendants' conduct is of a continuing nature that requires prompt relief. Defendants have uniformly represented to the general public through their representatives that their actions were legally appropriate when in fact they were not and/or have concealed material facts (as detailed throughout this Complaint); and the disclosure of such information was necessary to

make their other representations not misleading for want of disclosure of such omitted facts or because they possess superior knowledge of the true facts.

187.    Plaintiff and the Class Members have suffered, and continue to suffer, actual injury in fact due to Defendants' willful that are contrary to the public policy of California, are substantially injurious to consumers of California and constitute unfair trade practices and competition under Business & Professions Code § 17200, *et seq.*

188.    Based upon the obligations imposed upon Defendants and their experience in the industry, Defendants either knew, recklessly disregarded, reasonably should have known or were obligated under the law to provide correct and prompt information on the status of Plaintiff's SDIRA and notify Plaintiff if said SDIRAS failed to hold any identifiable assets.  Defendants failed to do so.  As a result, Plaintiff and the Class Members were subjected to unlawful, unfair and/or fraudulent treatment and Defendants were unjustly enriched and should be ordered to pay restitution pursuant to Business and Professions Code §§ 17203 and 17204.

189.    Members of the general public also face irreparable harm, such as, *inter alia*, not being fully informed of the true facts, having the status of their SDIRA wrongfully misrepresented, and/or the associated financial information as to the value of their investment being falsely reported.

190.    Equitable relief is appropriate to ensure adequate controls are in place to remedy the wrongful acts, prevent recurrence, and apprise the public of the true facts regarding what transpired.  Pursuant to Business and Professions Code § 17203, Plaintiff is entitled to preliminary and permanent injunctive relief requiring Defendants to cease this unfair competition, as well as disgorgement of all of Defendants' profits associated with this unfair competition.

191.    Plaintiff and the Class Members seek an order from this Court prohibiting Defendants from engaging or continuing to engage in the unlawful, unfair, or deceptive business acts or practices set forth in this Complaint and/or ordering that Defendants perform their obligations under the law and reimburse Plaintiff and the Class Members all monies owed them as alleged in this Complaint.

192.   Plaintiff and the Class Members additionally request an order from this Court requiring that Defendants make restitution of profits and return or pay to Plaintiff and the Class Members all of Defendants' ill-gotten gains obtained from the illegal transactions and Ponzi schemes and/or pay restitution, including the amount of monies that should have been paid had Defendants complied with their legal obligations, or, as equity requires.

193.   The above-described unlawful, unfair or fraudulent business acts and practices engaged in by Defendants continue to this day and/or present a threat of irreparable harm to the general public.  Defendants have failed to publicly acknowledge the wrongfulness of their actions and provide the complete relief required by the statute.

194.   Pursuant to Business & Professions Code § 17203, Plaintiff, on behalf of the Class and the general public, seeks a temporary, preliminary and/or permanent order from this Court prohibiting Defendants from continuing to engage in the unlawful, unfair, or fraudulent business acts or practices set forth in this Complaint and from failing to fully disclose the true facts as set forth herein, and or ordering Defendants or their representatives to stop misleading the public and engage in a corrective campaign, particularly in light of the public misperception created by Defendants and/or their representatives' misstatements and omissions of material fact, as well as provide appropriate equitable monetary relief as the court deems just and appropriate to all persons with a vested interest therein.

195.   Plaintiff and the Class Members further requests a court order that an asset freeze or constructive trust be imposed over all monies in the Defendants' possession that rightfully belong to Plaintiff and the Class Members.

196.   Plaintiff requests judgment and restitution from Defendants in an amount to be proven at trial for unfair, fraudulent and illegal business practices, treble damages and attorney's fees together with court costs.

## COUNT V

## CIVIL R.I.C.O.[2]

(Against All Defendants)

197.    Plaintiff incorporates the allegations contained in all the prior paragraphs as if restated and fully set forth herein.

198.    At all relevant times, Defendants  PROVIDENT TRUST, MY SELF DIRECT, BAE, KABAJOUZIAN and VANGUARD together constituted an enterprise within the meaning of 18 U.S.C. §1961 (4) and §1962 (c) in that it was and is a union or group associated in fact which perpetrated a fraudulent scheme.

199.    Defendants are persons within the meaning of 18 U.S.C. § 1961 (3) and § 1962 (c) who associated with and/or participated in the conduct of the enterprises, affairs, and/or conducted, participated in, engaged in, conspired to engage in, or aided and abetted the conduct and affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §1961 (1), §1961 (5), and §1962 (c).

200.    All of the acts referred to above occurred after the effective date of RICO and more than two such acts occurred within 10 years of one another.

201.    BAE and KABAJOUZIAN, who offered investments to Plaintiff and the Class Members, along with VANGUARD, a real estate title company, MY SELF DIRECT, an IRA facilitator, and PROVIDENT TRUST, a SDIRA CUSTODIAN, together  all offered and promised Plaintiff and the Class Members the opportunity to purchase occupied, rehabbed residential property in Detroit, Michigan; they guaranteed investment returns of 15% through cash transactions and/or transactions made through PROVIDENT TRUST SDIRAS with Plaintiff and the Class Members' retirement monies.  What Plaintiff and the Class Members were actually "sold" by Defendants were "phantom" real estate investment properties, because none of the Defendants ever owned or held legal title to *any* of the properties sold to Plaintiff and the Class Members. Defendants' common enterprise profited from the sale of the "phantom" investment

---

[2]     Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.*

properties through their receipt of the proceeds of the phantom real estate investment sales; receipt of lucrative fees and commissions for administering, facilitating and consummating the "phantom" real estate investment sales; and receipt of fees and commission for sales of PROVIDENT TRUST SDIRA services to Plaintiffs and the Class Members to consummate the "phantom" real estate sales.

202.   Defendants could and did foresee that the United States Postal Service, interstate wires, and electronic mail would be used for the purposes of advancing, furthering, executing, concealing, conducting, participating in, and/or carrying out the fraudulent scheme within the meaning of 18 U.S.C. § 1341 and § 1343.

203.   In particular, Defendants could and did foresee that those communication implements would be used to receive and/or deliver the data and documents described hereinabove (such as advertising and marketing materials, seminar materials, SDIRA account statements, and applications and documents related to the opening and maintaining of SDIRAS).

204.   Defendants, acting singly and in concert, personally, and/or through their agents as co-conspirators, or as aiders and abettors, used the United States Postal Service, interstate wires, and electronic mail for the purpose of advancing, furthering, executing, concealing, conducting, participating in, and carrying out the fraudulent scheme within the meaning of 18 U.S.C. § 1341 and § 1343.

205.   Plaintiff is informed and believes that additional specific instances of mail and wire fraud were utilized by Defendants to advance, further execute and conceal the fraudulent scheme and that such communications are, at the present time, within the exclusive knowledge of those Defendants and other presently unknown individuals or entities.

206.   Plaintiff is informed and believes that each and every use of United States Postal Service, interstate wires, and electronic mail described above was committed by these Defendants with the specific intent to defraud Plaintiff and other Class Members and for obtaining the money and property of Plaintiff and other Class Members by means of false or fraudulent pretenses, representations, and promises.  It is therefore alleged on information and belief that these acts of

---

mail and wire fraud made by Defendants are in violation of 18 U.S.C. § 1341 and § 1343 and constitute racketeering activity as defined by 18 U.S.C. § 1961(1)(B).[3]

207.   Plaintiff and other class members justifiably relied on the fraudulent representations, omissions, and deceptive practices by Defendants pursuant to the above-described fraudulent scheme.

208.   Plaintiff is informed and believes that at all relevant times, the enterprise alleged herein was engaged in and its activities affected interstate commerce and foreign commerce.

209.   Plaintiff is informed and believes that each and every predicate act described herein above was related, so as to establish a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962 (c) in that: (a) their common purpose was to defraud Plaintiff and Class Members of their money and property; (b) the common result was the same; and (c) Defendants individually, personally, or through their agent or agents, directly and indirectly, participated in all of the acts and employed the same or similar methods of commission.

210.   Plaintiff is informed and believes that each and every predicate act described herein and above by Defendants was continuous so as to form a pattern of racketeering activity in that: (a) they engaged in the predicate acts over a substantial period of time; and (b) the predicate acts have become the regular way of these Defendants conducting their business, and said racketeering business practices will continue indefinitely into the future.

211.   Plaintiff is informed and believes that as a direct and proximate result of and by reason of the activities of Defendants as alleged in this cause of action, Plaintiff has been injured in business and property within the meaning of 18 U.S.C. § 1964 (c) and, among other things, has suffered damages in the amounts and to the extent alleged in this Complaint which are incorporated herein by reference. Plaintiff is therefore entitled to recover three times the damages sustained, together with the costs of suit, including reasonable attorneys' fees and reasonable experts' fees.

---

[3]   Plaintiff is informed and believes that in connection with their fraudulent scheme Defendants committed violations of law (other than mail fraud or wire fraud) which fall within the R.I.C.O. statute;  at the present time, these other violation are within the exclusive knowledge of Defendants and will be learned through the discovery process.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff, on behalf of herself and all others similarly situated, demands upon Defendants jointly and severally for:

1.     An Order certifying the case as a class action;

2.     An Order appointing Plaintiff as the Class Representatives of the Class.

3.     An Order appointing undersigned counsel and their firms as counsel for the Class;

4.     As to Count I compensatory damages and punitive damages;

5.     As to Count II, compensatory damages and punitive damages;

6.     As to Count III, compensatory damages and punitive damages;

7.     As to Count IV, compensatory damages, punitive damages, statutory penalties, and attorney's fees under statute and private Attorney General statutes;

8.     As to Count V, treble damages, costs of suit, reasonable attorney's fees and expert fees;

9.     That an order that a constructive trust be imposed over all monies in Defendants' possession that rightfully belong to Plaintiff and/or an asset freeze of monies belonging to Defendants, and attorney's fees under private Attorney General statutes;

10.    As to all counts, attorney's fees per the SDIRA account contract and *Civil Code* § 1717;

11.    As to all counts, pre and post-judgment interest as allowed by law;

12.    As to all counts, an award of taxable costs; and

13.    As to all counts, any and all such further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, individually and on behalf of the Class Members, hereby demands a trial by jury as to all issues so triable as a matter of right.

1

2

3  Dated: May 7, 2013

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

SNYDER ♦ DORENFELD, LLP

By: _____
MICHAEL W. BROWN

David K. Dorenfeld, (State Bar No. 145056)
Michael W. Brown, (State Bar No. 205380)
5010 Chesebro Road
Agoura Hills, CA 91301
Telephone: (818) 865-4000
Fax:   (818) 865-4010

CATHY JACKSON LERMAN, PA
Cathy J. Lerman
#118, 1440 Coral Ridge Drive
Coral Springs, FL 33071
Telephone: (954) 332-1143
Facsimile:  (800) 305-2351
Email: clerman@lermanfirm.com
TO BE ADMITTED PRO HAC VICE

BURSOR & FISHER, P.A.
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email: ltfisher@bursor.com

Attorneys for Plaintiff

CLASS ACTION COMPLAINT                37